## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VALLEY JOIST, LLC, | : |
| Plaintiff, | : Civil Action No. 21-20374 (JTQ) |
| v. | : **OPINION** |
| OEG BUILDING MATERIALS, INC., | : |
| Defendant. | : |

### I.    INTRODUCTION

This action was brought by Plaintiff Valley Joist, LLC ("Plaintiff" or "Valley") against Defendant OEG Building Materials, Inc. ("Defendant" or "OEG"). A three-day bench trial was held from June 9 through June 11, 2025, during which the Parties presented competing evidence relating to Plaintiff's claims for breach of contract. This Opinion constitutes the Court's findings of fact and conclusions of law. After careful consideration of the evidence before it, the Court finds in Plaintiff's favor for the breach of contract claim and awards damages to account for the breach.

### II.    BACKGROUND

#### A. The Parties and Their Business Relationship

Plaintiff is in the business of designing, engineering, and manufacturing a full range of steel joist and deck product systems. ECF No. 43, Final Pretrial Order ("FPTO") 3(a). In the normal course of business, Plaintiff sells steel joist and deck products to general contractors for use in commercial construction projects. *Id*. Defendant is a manufacturer and distributor of steel building materials, including

framing and decking products for the commercial and residential construction industry. *Id*. 3(b). The business relationship between the Parties began in about 2018 and continued until 2021. ECF No. 61, Transcript Volume I, ("Tr. Vol. I") 69:18-23.[1]

The Parties adhered to a general process for establishing the material terms of their agreements for the purchase and delivery of steel products. First, Plaintiff would request a quote for materials from Defendant. Tr. Vol. I 66:8-67:5. In response, Defendant would provide Plaintiff with a price quote, which Plaintiff used in its bids to general contractors for work. Tr. Vol. I 67:1-5. Delivery costs were typically accounted for in Defendant's quote. ECF No. 62, Transcript Volume II ("Tr. Vol. II") 222:12-20; ECF No. 63, Transcript Volume III ("Tr. Vol. III") 432:16-24. Once the customer accepted Plaintiff's bid, Plaintiff would confirm Defendant's quote—and, if necessary, Defendant would adjust the quote based on any lapse of time. Tr. Vol. I 79:17-80:9; Tr. Vol. I 82:3-10; P-63; Tr. Vol. III 431:16-23. With this confirmation, Plaintiff issued a purchase order ("PO") to Defendant reflecting the agreed-upon terms. Tr. Vol. I 72:8-11.

Here, the Parties dispute whether three of Plaintiff's POs formed binding contracts, obligating Defendant to purchase the necessary raw materials to fill POs for the commercial projects at issue. Tr. Vol. II 279:15-17; Tr. Vol. III 456:10-457:8; Tr. Vol. I 67:6-12; 71:7-13; 89:16-91:15; Tr. Vol. II 179:1-6; Tr. Vol. II 185:5-11; Tr. Vol. II 193:9-18.

Plaintiff's understanding of its negotiations with Defendant was that although

---

[1] The page numbers cited herein are those generated on the Transcript.

a delivery date was not typically included in Plaintiff's PO, the Parties knew that the PO would have a "future delivery window" once accepted. Tr. Vol. I 135:2-23; Tr. Vol. III 436:18-437:3. And it was standard for Defendant to honor Plaintiff's PO for 120 days from issuance, even if raw materials or other costs escalated during that time period. Tr. Vol. II 311:17-312:2; Tr. Vol. II 432:9-11. Put differently, Defendant knew "time was of the essence" in all orders. Tr. Vol. III 453:3-18; Tr. Vol. III 464:9-11.

After issuing a PO, Plaintiff would provide Defendant with a bill of materials, or cut list, detailing what was to be cut to ensure the correct materials were delivered to the job site. Tr. Vol. I 67:20-68:8; Tr. Vol. I 87:1-88:4. Defendant then reviewed the cut list, converted it into a sales order or quote form, then sent the quote form back to Plaintiff for approval. Tr. Vol. II 275:8-17; Tr. Vol. III 479:17-480:16. Until the summer of 2021, this was the way Plaintiff and Defendant conducted business without issue. Tr. Vol. I 150:16-24; Tr. Vol. II 185:5-11; Tr. Vol. II 192:14-20; Tr. Vol. II 311:1-6; Tr. Vol. II 345:24-246:8.

On December 7, 2021, Plaintiff filed a Complaint against Defendant for breach of contract regarding three distinct projects: the Waterfront Project, the Atlanticare Project, and the Nestle Project.

### B. Witnesses at Trial

During the three-day trial, the Parties were each provided the opportunity to present evidence. Eight witnesses were called. Each witness was called by Plaintiff but both Parties questioned the witness at the time he/she was called. No witnesses were re-called by Defendant. Below, the Court identifies each witness and provides

a brief description of their testimony.

- Keeisa Gant has worked in Valley's sales department since 2019. She testified virtually regarding the standard operating procedure for confirming Plaintiff's POs with Defendant.

- John Hoffman served as Valley's mid-Atlantic sales representative and project manager at the time relevant to Plaintiff's allegations. He offered testimony relating to Plaintiff's negotiations and agreements for the delivery of steel products.

- Thomas Szoke is the owner of Szoke Brothers, Inc. ("Szoke"), a customer of Plaintiff's. Mr. Szoke testified virtually regarding his business dealings with Plaintiff and any knowledge he had of agreements between Plaintiff and Defendant related to the Waterfront Project.

- Keith Juedeman is Valley's President. He testified regarding his understanding of the negotiations and agreements between Plaintiff and Defendant.

- Asher Engel is a principal at OEG. Mr. Engel testified about Defendant's business procedures and negotiations with Plaintiff.

- Philip Schlosser is a principal at Schlosser Steel, a customer of Plaintiff's. Mr. Schlosser testified virtually regarding his business generally, his business with Plaintiff, and the order with Plaintiff on the Atlanticare Project.

- Timothy Day is now Valley's Chairman of the Board. He was President and CEO of Valley at all times relevant to this action. Mr. Day testified regarding his business dealings at Valley and his negotiations with OEG on all three projects at issue.

- Gedalia Liebes is a principal at OEG. Mr. Liebes testified about his negotiations with Valley on all three projects and specifically addressed the contents of Plaintiff's POs and what he understood them to mean.

## III.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. The Projects

#### 1. The Waterfront Project

Szoke placed an order with Plaintiff for steel deck materials and related work for a project located at 615 Waterfront Drive, Allentown, Pennsylvania (the "Waterfront Project"). FPTO 3(d). Mr. Hoffman, Plaintiff's mid-Atlantic sales representative and project manager at the time (Tr. Vol. I 60:11-20), contacted Defendant for information on obtaining materials for the Waterfront Project. *Id*. 3(e); P-63 at VALLEY000018. On January 7, 2021, Mr. Liebes responded to Mr. Hoffman's request for information and provided proposed prices to purchase steel material. P-63 at VALLEY000017; Tr. Vol. I 76:23-25. On January 22, 2021, Mr. Hoffman advised Mr. Liebes that Valley was likely to be the low bidder on the Waterfront Project. P-63 at VALLEY000017. In this e-mail, Mr. Hoffman relayed that delivery was anticipated to start in mid-June 2021 and asked that Defendant "hold/extend the current pricing listed" until Plaintiff could secure the PO on the project. *Id*. At trial,

5

Mr. Hoffman testified that the purpose of this e-mail was to confirm that Defendant could honor the January 7 pricing so Plaintiff could issue a PO per the previous pricing. Tr. Vol. I 77:22-78:3.

On January 29, 2021, Mr. Hoffman e-mailed Mr. Liebes again. In this e-mail, Mr. Hoffman confirmed that Plaintiff's customer was awarded the Waterfront Project and "would like to issue us a PO based on our pricing from 1-7-21." P-63 at VALLEY000016. Mr. Hoffman continued, "[w]e would like to cut you a PO based on the units below today. Please confirm." *Id*. At trial, Mr. Hoffman explained that seeking such confirmation was a "general practice" with Defendant because "while [Mr. Liebes] was our representative for pricing at the time, you have to check with your purchasing managers for raw material." Tr. Vol. I 79:19-24. Later that morning on January 29, Mr. Liebes confirmed via e-mail, "[w]e're good to go!" P-63 at VALLEY000016. Mr. Hoffman testified that he took this e-mail from Mr. Liebes as confirmation of their previous discussion on the Waterfront Project so Plaintiff "issued a PO per the unit prices listed from 1/7, as agreed in this e-mail." Tr. Vol. I 80:4-9. Mr. Hoffman further testified that he interpreted this e-mail exchange, P-63, as confirmation of the mid-June delivery date. Tr. Vol. I 80:11-14. He explained that pursuant to the confirmation received in this e-mail correspondence, Plaintiff issued a PO dated January 29, 2021, for steel deck material for the Waterfront Project for the total price of $179,338.45. Tr. Vol. I 80:22-81:10; P-11.

At trial, Mr. Hoffman testified that the Waterfront PO included freight but said "will advise" for delivery dates. Tr. Vol. I 140:11-22. He explained that the PO

secured price and quantity, not delivery dates. Tr. Vol. I. 141:2-5. This fact was one that the parties stipulated to even before the start of trial. FPTO 3(j). That delivery dates were ascertained between the Parties separate from the issuance of the PO is consistent with Mr. Liebes' trial testimony that it was "very likely" he used e-mail communication and POs together before moving forward with a deal with Plaintiff. Tr. Vol. II 436:14-17.

On May 5, 2021, Ms. Gant sent Asher Engel the bill of materials for the Waterfront Project and Mr. Engel testified that when he received them, he determined that the PO was "too old." Tr. Vol. II. 273:19-274:3. Then, without asking Plaintiff for a new PO, Mr. Engel instructed Mr. Liebes to come up with new pricing to send Plaintiff. Tr. Vol. II 271:17-19, 273:16-23, 274:4-6. Mr. Liebes testified that although the 120-day window for the Waterfront PO remained open on May 5, receiving the bill of materials completed the PO and allowed Defendant to determine it was no longer able to execute the PO. Tr. Vol. III.

At trial, Mr. Liebes stated that Mr. Engel told him the reason Defendant could no longer commit to the Waterfront PO delivery dates was "steel climate." Tr. Vol. III 444:13-21. Mr. Hoffman confirmed that the explanation he received for the cost escalation was the climate but heard nothing about difficulties with mills delivering inventory. Tr. Vol. II 99:20-100:2. Mr. Hoffman testified that had Defendant advised Plaintiff that it did not have the inventory to fill the Waterfront Project order, Plaintiff would have located alternate sources. Tr. Vol. I 101:24-102:6.

Tim Day echoed this sentiment when he testified that he reached out to Mr.

Engel upon learning of the escalation price because it was "very, very high versus the prices we were paying." Tr. Vol. II. 312:22-313:9. He conveyed that if Plaintiff was going to pay such a high rate it wanted to "lock in the delivery date." Tr. Vol. II. 313:6-9; P-9 at OEG_000452-53. It was Plaintiff's understanding, as confirmed by Keith Juedeman, that where an escalation cost is imposed, there will be delivery. Tr. Vol. II. 248:5-11. Mr. Juedeman testified that where an escalation cost is charged, "it is definitely understood that we will perform on that project." Tr. Vol. II. 248:12-19.

Mr. Hoffman testified that he asked Mr. Liebes to accept the delivery early to avoid escalation costs but "that option wasn't available for some reason" and "the only option given was to agree to the escalation cost" Tr. Vol. I 96:5-97:1. So, believing the ordered material would be delivered, Plaintiff agreed to the escalated pricing. Tr. Vol. I 2-6. On May 11, 2021, Defendant reissued its quote for steel goods for the Waterfront Project. P-25 at OEG_000435. Mr. Liebes' e-mail containing the new quote also included language that stated, "[p]rices are held for 60 days from the date of the PO and all material must ship by that date." *Id*. On June 7, 2021, Mr. Hoffman e-mailed Defendant confirming that Plaintiff had adjusted the bill of materials as Defendant requested and seeking confirmation that the previously agreed upon delivery dates could be accommodated. P-28 at OEG_000499; Tr. Vol I. 106:1-17. When Mr. Hoffman did not receive a response, he sent another e-mail on June 9 containing additional site and sequencing information with load times. P-28 at OEG_000498-99; Tr. Vol. I 106:18-24. Mr. Liebes responded on June 11, informing Plaintiff for the first time that Defendant would not be able to start shipping until late July/early August. P-28 at

OEG_000497-98; Tr. Vol. I 107:16-23.

Thereafter, Plaintiff began expressing its dissatisfaction with Defendant's refusal to commit to a delivery schedule. Mr. Juedeman, Mr. Hoffman, and Mr. Day all responded to Mr. Liebes' e-mails conveying the importance of getting an improved delivery schedule because the delay was impacting its customer, Szoke. P-28 at OEG_000502-03; P-28 at OEG_000500. After Mr. Liebes said he would forward the e-mails to management, Mr. Engel e-mailed Mr. Hoffman saying for the first time that Defendant "was not equipped to give exact delivery dates." P-29 at OEG_000502, OEG_000500.

On June 21 and 22, 2021, Defendant provided two revised quotes that Mr. Hoffman confirmed on behalf of Plaintiff on June 29, 2021. P-31 at OEG000537-38. In Mr. Liebes' June 21 e-mail, he stated that he would "convert [the quotes] to orders and send off to production." P-31 at OEG_000538. Mr. Hoffman testified that with every prior project the Parties worked on, once Plaintiff confirmed a cut list, it was then produced. Tr. Vol. I 112:4-114:6. However, Mr. Liebes testified that none of the material on the cut list addressed in the June 21 to June 29 e-mails (P-31) was converted into a confirmation or ever made it to the production line. Tr. Vol. III 448:11-449:10. Mr. Juedeman testified that Plaintiff never saw evidence that Defendant started production on a single piece of deck material for the Waterfront Project. Tr. Vol. II 250:13-15.

On July 20, 2021, Mr. Hoffman reached out to Defendant seeking guidance and expressing its customer's concern about production and the delivery plan on the

Waterfront Project. D-26 at OEG_001218-19. Mr. Engel responded saying that Defendant could not "give or commit to firm schedules" because they were relying on the mills, which kept "pushing [them] out." D-26 at OEG__001218. In this correspondence, Mr. Engel also refused to meet with Plaintiff or Plaintiff's client regarding the delivery schedule, and said "I don't see a point in a face to face meeting [sic]." *Id.*

On July 23, 2021, after another request for delivery dates from Mr. Hoffman, Mr. Engel blamed the continued delays on the mills running behind schedule. P-34 at OEG_001145-46. Plaintiff's requests for delivery updates went unaddressed through July 26, 2021. *See, generally,* P-35. On July 26, Mr. Liebes sought updates internally and the next day, July 27, 2021, Nate Fessel confirmed Defendant had 157,000 pounds of the material necessary to make the Waterfront deck on hand. P-35 at OEG_001147-48; Tr. Vol. III 451:8-452:6. Mr. Liebes testified that he believed the 157,000 pounds OEG had on hand at the time would have been enough raw material to fabricate the first sequence of the Waterfront deck order. Tr. Vol. III 452:14-16. Mr. Liebes further testified that at the time of these e-mails, July 27, 2021, it was likely that Defendant's deck forming machine was "busy on other work and orders [Defendant was] fulfilling." Tr. Vol. III 452:17-453:2.

At trial, Mr. Liebes stated that at the time Defendant received the Waterfront cut list from Plaintiff, he understood that time was of the essence. Tr. Vol. III 453:15-18. But, as of August 5, 2021, Defendant had yet to deliver a single piece of deck material under the Waterfront project. Tr. Vol. III 379:18-21. At this time, Szoke was

10

threatening to hold Plaintiff in default of its contract. Tr. Vol. II 340:11-14. So, Mr. Day testified that as the president of Valley at the time, he made a "commercial decision to work with [ ] Szoke to find a decking source to meet [its] requirements, and made the decision to put OEG on notice that they were in default." Tr. Vol. II 341:11-15. Mr. Day explained that the "value of that solution" was Plaintiff's payment of $400,000 to Szoke. Tr. Vol. II 348:3-7. Mr. Day testified that this money was paid by a $100,000 check and an agreement between Plaintiff and Szoke that future orders Szoke placed would be at a discount. Tr. Vol. II 348:10-25. Mr. Szoke initially testified that he did not receive a check from Plaintiff (Tr. Vol. II. 241:11-14) and on redirect examination corrected his answer to say, "[y]es, there was. I'm sorry. There was a check written up front to help us with the cost, and then it was further complemented by future projects that we had in agreement with them." Tr. Vol. II. 242:15-20. Plaintiff provided additional support for this testimony at trial through one of its Exhibits.  P-70.

## 2.  The Atlanticare Project

Plaintiff's customer Schlosser Steel placed an order with Plaintiff to provide steel deck materials for a project known as the Atlanticare Medical Building in Atlantic City, New Jersey. FPTO 3(l). Unlike the Waterfront Project, which was to be entirely outsourced from OEG, the Atlanticare Project was to include half OEG-supplied product and half in-house Valley-supplied product. Tr. Vol. I 124:24-125:12. On January 4, 2021, Defendant responded to Plaintiff's request for a price quote for the Atlanticare Project and on January 21, 2021, Plaintiff sent an e-mail containing

11

a PO in the amount of $57,587.00. P-62 at VALLEY000011-12, VALLEY000015.

On June 4, 2021, Ms. Gant asked Defendant for an update on the Atlanticare Project quote. P-32 at OEG_000542. Mr. Hoffman testified that Plaintiff asked for the update because the drawing process was delayed by Plaintiff's customer, making it so Plaintiff could not issue the bill of materials in the time of a standard PO. Tr. Vol. I 83:21-82:15. Mr. Hoffman further explained that when this happens, there are escalation costs, so Plaintiff wanted to verify with Defendant that the original pricing would still apply. Tr. Vol. I 83:16-22. On July 6, 2021, Plaintiff asked for and received another updated price. P-32 at OEG_000540-41. The next day, July 7, 2021, Mr. Hoffman asked Mr. Liebes if he could do anything to improve the delivery because Plaintiff was "hoping to start in August 2021." D-32 at OEG_000547. Mr. Liebes responded, "I wish I could . . . we are not receiving shipments from the mills at the promised delivery dates. As things stand now, late Sept/[O]ct is most realistic." *Id.* Like the later e-mails between the Parties on the Waterfront Project, Mr. Liebes' reply contained the following language: "[p]rices are held for 60 days from the date of the PO, and all material must ship by that date." P-32 at OEG_000542.

In July 2021, Mr. Schlosser sent a letter to Plaintiff stating that Schlosser was bound by its contractual obligations with its customer to deliver and install composite deck starting July 19, 2021. P-69. The letter further provided that because Plaintiff was unable to provide a firm delivery date, Schlosser had to purchase the composite deck from an alternate supplier for $220,000.00. *Id.* The letter stated that Schlosser would deduct this amount from its total outstanding invoices to Plaintiff. *Id.*; Tr. Vol.

12

II 297:16-20.

Mr. Day testified that as of August 5, 2021, the date of termination, Defendant had not produced any material to Plaintiff in connection with the Atlanticare Project. Tr. Vol. III 379:22-24. Mr. Liebes' testimony confirmed that Defendant never put a single sheet of coil into its production line to produce deck materials for this project (and the Waterfront Project). Tr. Vol. II 259:2-6. Despite Plaintiff's efforts throughout the process, Mr. Hoffman testified that Plaintiff simply could not get Defendant to establish a firm delivery date. Tr. Vol. I. at 165.

### 3. The Nestle Project

The third dispute involves an unrelated project, referred to as the Nestle Project. For this particular project, Plaintiff purchased roof decking materials from Defendant. FPTO 3(t). The decking material was a "hot-dipped [and] galvanized product," (Tr. Vol. II at 316:24-25), which was to be installed and used by one of Valley's customers—RAI Industrial Fabricator (Tr. Vol. II at 341:20-25)—at a Purina factory being constructed in Georgia. FPTO 3(u). The materials were to be defect free—*i.e.*, the metal sheets were not to have rusting, staining, and/or signs of oxidation. *See* Tr. Vol. III 419:21-23.

On April 21, 2021, Plaintiff notified Defendant of rust on the roof decking Defendant provided in connection with the Nestle Project. P-41 at OEG_000281-83. Having received no response from Defendant, Mr. Day followed up on April 23, 2021, and that same day, Mr. Liebes sent an e-mail apologizing for the staining and oxidation and acknowledging that there were issues with the materials Defendant

provided. P-41 at OEG_000278-81; Tr. Vol. II 324:6-21.

Mr. Day testified that he took this response to mean that "OEG would address the problem with us." *Id.* Mr. Liebes sent a more formal e-mail response later that day acknowledging that the oxidation and staining "should not have happened," assuming responsibility, and agreeing to replace affected sheets. P-41 at OEG_000278. Mr. Day testified that with respect to the rusted sheets, Plaintiff had to send its "own crew out to do remediation, sand the deck, and touch up the deck with touchup paint" and supply some of Plaintiff's own deck to replace what was part of Defendant's PO that was rusted. Tr. Vol. II 325:8-15.

### B. Time is of the Essence Clause

The POs Plaintiff sent Defendant contained a "Time of the Essence" clause in its terms and conditions page. P-1, VALLEY006270. Keeisa Gant testified that since 2019, she generally communicated with Mr. Liebes of OEG to confirm POs between Plaintiff and Defendant. Tr. Vol. I 8:22-10:2; Tr. Vol. I 11:10-23. In one particular PO confirmation e-mail that Ms. Gant sent Mr. Liebes on July 16, 2019, she forgot to enclose Plaintiff's terms and conditions page. *See* P-2. Ms. Gant followed up with Mr. Liebes the next day; she specifically asked Mr. Liebes whether she should attach the terms and conditions page to every e-mail. Mr. Liebes responded that there is "no need to send." *Id.* Ms. Gant testified at trial that she understood this communication to mean for that PO, and POs in the future, she did not have to attach terms and conditions. Tr. Vol. I 14:19-22.

Ms. Gant further explained that sending single-page POs to OEG became

standard operating procedure. Tr. Vol. I 57:9-14. In April 2021, Plaintiff began using new software to issue its POs, which generated them with the terms and conditions automatically attached. Tr. Vol. I 20:2-22. It was not until June 9, 2021, that Mr. Liebes returned a rejected PO dated April 14, 2021 to Ms. Gant with an "X" through the terms and conditions page. P-3, OEG_000491.

### C. Breach of Contract

#### 1. Legal Standard

"To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Days Inns Worldwide, Inc. v. Jaishree, Inc.*, 2017 WL 319178, at *3 (D.N.J. Jan. 23, 2017). "A plaintiff bringing a breach of contract claim under New Jersey law has the burden of proof for all elements of the claim." *Giacobbe v. QBE Specialty Ins. Co.*, 2018 WL 2113266, at *4 (D.N.J. May 8, 2018).

To form a valid contract, there must be "1) a meeting of the minds; 2) offer and acceptance; 3) valid consideration; and 4) reasonably certain contract terms." *Carrington Tea Co. v. Pretium Packaging L.L.C.*, 2023 WL 2182310, at *3 (D.N.J. Feb. 23, 2023). Mutual assent, "sometimes referred to as a 'meeting of the minds,'" measures acceptance "not by the parties' subjective intent, but rather by their outward expressions of assent." *Morales v. Sun Constructors, Inc.*, 541 F.3d 218, 221 (3d Cir. 2008). "For a contract to be enforceable there must be a meeting of the minds for each material term to an agreement." *World Express & Connection, Inc. v. Crocus*

15

*Invs., LLC*, 2020 WL 5088633, at *13 (D.N.J. Aug. 28, 2020). And the essential terms of a sales contract are price, quantity, delivery, and payment method. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 291 (3d Cir. 2017). "For the requirement of 'reasonably certain contract terms,' the Court must be able to determine the contracts [sic] essential terms to which the parties manifested an intent to be bound." *Marina Grp. LLC v. Shirley May Int'l US Inc.*, 2024 WL 3325993, at *5 (D.N.J. July 8, 2024) (internal quotation marks omitted) (alteration in original).

### 2. The Waterfront Project.

### i.    Plaintiff Proved There Was A Contract.

The Court heard testimony from multiple witnesses, from both Valley and OEG, who said they understood a PO to be a firm and binding commitment. Tr. Vol. I 67:17-19 (Mr. Hoffman testifying a PO is a "firm commitment); Tr. Vol. II 307:22-308:3 (Mr. Day testifying Valley has an obligation to perform after a PO because a PO is a "binding agreement"); Tr. Vol. III 379:6-12 (same); Tr. Vol. II 258:24-259:1 (Mr. Engel testifying that a PO is a "binding commitment"). Nonetheless, Defendant's position has been that the Parties did not have a meeting of the minds as to the delivery date and, therefore, the Parties had no contract.[2]  In support of this position, Defendant relies on the ongoing negotiations between the Parties. Mr. Hoffman testified that delivery dates are not "firm" and new dates arise "every day." Tr. Vol. I 164:3-12. At trial, Mr. Day echoed this sentiment that "in the business . . . delivery

---

[2] No evidence was presented at trial to suggest the meeting of the minds on any other material term of the Parties' agreements was contested.

dates start to move as projects develop." Tr. Vol. II 308:11-13. The Court found both Mr. Hoffman and Mr. Day to be credible witnesses based on the knowledgeable manner they both testified about the norms in their industry, as well as the manner in which their business negotiations with Defendant typically took place. And their testimony on delivery windows does nothing to undermine the Court's determination regarding the formation of a contract.

To be sure, as Mr. Hoffman explained, Plaintiff's POs did not usually include a delivery date, but it was well understood that there would be a "future delivery window" once the PO was accepted. Tr. Vol. I 135:2-23; Tr. Vol. III 436:18-437:3. And the evasive answers provided by Mr. Engel on this topic reinforce the Court's finding. Specifically, Mr. Liebes testified that delivery windows are "possibly" established outside the PO, stated that he could not answer certain questions as he does not "use any general rules," and claimed to not recall when asked about delivery to Plaintiff or receipt of the bill of materials on the Waterfront Project. Tr. Vol. III 435:9-439:5. In short, Messrs. Liebes' and Engels' testimony were not credible. To that end, the Court accepts Mr. Hoffman's testimony on the standard procedure for agreeing upon a delivery window.

The Court further concludes that Defendant never rejected Plaintiff's proposed delivery windows. Indeed, Defendant never expressly rejected Plaintiff's proposed terms; instead, Defendant strung Plaintiff along by continuing to push the date out, which fostered a false sense of hope of delivery. In fact, the evidence shows that Plaintiff would have preferred an outright rejection early on. Mr. Hoffman testified

that had Defendant told Plaintiff that Defendant's inventory was insufficient, Plaintiff would have found alternate sources. Tr. Vol. I 101:24-102:6. But instead Defendant gave Plaintiff responses as seemingly concrete as "[w]e're good to go!" when Plaintiff stated in January that it anticipated delivery to start mid-June 2021. P-63 at VALLEY000016-17.

The Court finds that the trial evidence established the existence of a contract between the Parties on the Waterfront Project. All material terms were sufficiently clear and understood by both Parties and the fact that delivery windows change as a project progresses in this industry does not change that conclusion.

### ii.    Plaintiff Proved Defendant Breached.

The breakdown in the Parties' standard procedure began, however, when Mr. Engel decided the January Waterfront PO was "too old" to fulfill in May of 2021, despite the fact that the 120-day window for the PO remained open. Tr. Vol. II 271:17-19; Tr. Vol. II. 273:16-23. The Court gives particular weight to how Mr. Engel responded when asked about this decision on the stand. Specifically, the Court finds Mr. Engel's testimony lacked credibility as he claimed not to understand counsel's questions and never really answered how he came to the conclusion the PO was too old. Tr. Vol. II. 273:6-274:6.

Despite never receiving clarity on Defendant's decision, Plaintiff accepted the new, escalated cost because Plaintiff viewed the escalation as a further guarantee that Defendant would perform, and that the delivery would arrive soon. Tr. Vol. II 313:6-9; P-9 at OEG_000452-53; Tr. Vol. II 248:5-11; Tr. Vol. II 248:12-19. It was not

until June 21, 2021, that Defendant informed Plaintiff for the first time that it would not be able to start shipping until late July/early August. P-28 at OEG_000497-98; Tr. Vol. I 107:16-23. From that point on, Defendant claimed to be unable to commit to any delivery windows and declined requested meetings with Plaintiff's customer, Szoke, who was growing dissatisfied. P-29 at OEG_000502, OEG_000500; D-26 at OEG__001218.

The evidence shows that Defendant never filled Plaintiff's order on the Waterfront Project. Tr. Vol. III 379:18-21. Defendant never even sent the items for production. Tr. Vol. III 448:11-449:10; Tr. Vol. II 250:13-15. This is true even though there was no question that Defendant knew "time was of the essence" in all of Plaintiff's orders and had sufficient inventory to fabricate the first sequence of the Waterfront deck order as of July 26, 2021. Tr. Vol. III 453:3-18; Tr. Vol. III 464:9-11; Tr. Vol. III 452:14-16.

At trial, Plaintiff showed that Defendant was obligated to deliver the material Plaintiff ordered by the mid-June window it agreed to in January 2021. At the very least, Defendant was required to deliver the materials in accordance with its own 60-day delivery guarantee. P-25 at OEG_000435. Defendant failed to do either, thus breaching the contract with Plaintiff for the Waterfront Project.

### iii.    Plaintiff Proved Damages.

The final element—damages— " is essential to a[ny] breach of contract claim." *Caro Assocs. II, LLC v. Best Buy Co.*, 2012 WL 762304, at *6 (D.N.J. Mar. 6, 2012). In New Jersey, "the plaintiff bears the burden of proving . . . that he has in fact been

damaged[.]" *Giacobbe*, 2018 WL 2113266 at *5. The "amount of such damages [must be shown] with a reasonable degree of certainty." *Id.* (internal citation omitted).

Here, Plaintiff sustained its burden of proving that it was damaged and demonstrating most of its damages to a reasonable degree of certainty. At trial, Plaintiff provided credible damages evidence related to the Waterfront project and demonstrated that these damages were both foreseeable and flowed directly from Defendant's breach. Specifically, both Tom Szoke and Tim Day testified that Szoke was forced to look to another decking supplier for the decking when OEG failed to deliver the materials. Tr. Vol. II 233:18-24; Tr. Vol. III 369:21-25 – 370:1-17. And given the time and escalation in market pricing, the cost was "$400,000 above the price of [the] original PO from Valley to supply all the deck for" this project. Tr. Vol. III at 370:1-2. Both Messrs. Szoke and Day testified that Valley paid down the $400,000 and explained the ways in which the amount was satisfied.

Mr. Szoke testified that "[t]here was a check written up front to help us with the cost, and then it was further complemented by future projects that we had in agreement with [Valley.]" Tr. Vol. II 242-19-22; Tr. Vol. II 242:3-7. Mr. Day corroborated this testimony. He explained that the "[$]400,000 was paid off" through "a combination of barter against orders that had already been placed and not yet delivered[], a "check of $100,000," and the "remaining balance" would be "taken off of . . . future project[s]." Tr. Vol. II 348 15-18; *see also* Tr. Vol. III 370:20-25 – 371:1-2.

At trial, OEG made much of the alleged lack of documentary "proof" to support Valley's claimed damages. *E.g.*, Tr. Vol. III 399:3 – 404:24. Indeed, OEG went so far

as to say there was "an absolute lack of proof." Tr. Vol. III 404:14-15.  But the testimony set forth above presented credible proof of Valley's damages, because, as Valley's counsel aptly noted: "the testimony of the witnesses . . . is evidence." Tr. Vol. III at 4031-2.  And as a matter of law, this testimony by itself supported the quantum of damages Valley seeks.

Several decisions are instructive.  In *Natron Corp. v. Tuthill Corp.*, the court was dealing with a breach-of-contract case where the plaintiff conceded to having "no . . . documentary evidence" to support the requested damages.  2006 WL 2042609, at *1.  The court nonetheless concluded that that plaintiff could, even in the absence of such documentary evidence, prove its damages through testimony, which would, "of course, be subject to cross-examination by Defendant." *Id.* at *2.  And, in the end, it would "ultimately [be] for the jury to decide" whether "Plaintiff's testimony is believable." *Id.*

*Elzoghbi v. Macy's East* also is on point.  2009 WL 2488076 (E.D. Mich. Aug. 13, 2009).  There, the "Defendant insist[ed] that summary judgment [wa]s appropriate on the majority of Plaintiffs' economic damages because Plaintiffs have produced no documentation or other evidence of their purported losses." *Id.* at 2.  The *Elzoghbi* court rejected the argument, concluding that plaintiffs could attempt to establish damages through *inter alia* "personal testimony [and] the testimony of others." *Id.*; *see also St. Louis, L.L.C. v. Anthony & Sylvan Pools Corp.*, 2006 WL 1585739, at *6 (App. Div. June 12, 2006) (holding that testimony "in itself was sufficient to support plaintiff's damages claim.").

But this credible testimony was not the only piece of admissible evidence that supported Valley's damages. Indeed, Valley introduced documentary evidence showing that of the "$400,000 originally owed" to Szoke, there was an outstanding "balance" of "$72,000." P-70. Stated differently, by June 16, 2023, Valley had reimbursed Szoke $328,000. *Id.* And Mr. Day testified that "post-June 16, 2023," Szoke applied the remaining $72,000 credit to one of Valley's invoices. *See* Tr. Vol. III 375 12-14.

In sum, Valley's credible evidence established its damages to a reasonable degree of certainty. Based upon this evidence, the Court awards Valley $400,000.

### 3. The Atlanticare Project

#### i. Plaintiff Proved There Was A Contract.

Plaintiff and Defendant followed their standard negotiating procedure for the Atlanticare Project. Again, it was typical that the delivery date not be contained in the PO. Tr. Vol. I 135:2-23; Tr. Vol. III. 436:18-437:3. And while, unlike the Waterfront Project, Plaintiff did not provide Defendant with an estimated delivery window, the delivery window was nonetheless a part of the Parties' correspondence. Mr. Liebes' June 4, 2021 response to Plaintiff's request for an updated quote contained the language "[p]rices are held for 60 days from the date of the PO, and all material must ship by that date." P-32 at OEG_000542.

Beyond that, Ms. Gant testified that it was her responsibility to send confirmation e-mails to Defendant and as of July 2019, it was her understanding that Mr. Liebes no longer required Plaintiff to attach its terms and conditions to POs, as

22

it always had. Tr. Vol. I 14:19-22. In those terms and conditions was a "Time is of the Essence" clause. The Court found Ms. Gant to be an honest, credible witness and has no reason to question her interpretation of Mr. Liebes' e-mail. And whether Mr. Liebes did intend for Plaintiff to leave the terms and conditions page off all future POs is immaterial, because, as Mr. Liebes testified at trial, he understood time was of the essence when Defendant received the Waterfront cut list from Plaintiff. Tr. Vol. III 453:15-18.

Thus, the material terms of the Atlanticare agreement, including delivery window, were agreed to by the Parties. As with the Waterfront Project, the Court finds sufficient evidence was presented at trial to show there was a meeting of the minds between Plaintiff and Defendant on all essential terms sufficient to form a contract.

### ii.    Plaintiff Showed Defendant Breached.

At trial, Plaintiff introduced sufficient evidence of Defendant's breach as well. May 11, 2021 was the date of the first e-mail Plaintiff received from Defendant that contained the language, "[p]rices are held for 60 days from the date of the PO and all material must ship by that date." P-25 at OEG_000435. Yet, on July 6, 2021, nearly 60 days after Plaintiff received this e-mail, Mr. Liebes advised Ms. Gant that Plaintiff could expect delivery on the Atlanticare order by "Late Sept/Oct." P-31 at OEG_000540.

Defendant knew "time was of the essence" in all orders. Tr. Vol. III 453:3-18; Tr. Vol. III. 464:9-11. But by August 5, 2021, Plaintiff had not received any material

in connection with the Atlanticare Project. Nor had Plaintiff received any assurances from Defendant on when delivery could reasonably be expected.

The evidence shows Defendant agreed to certain contract terms but failed to deliver. Consequently, the Court finds that Plaintiff presented sufficient evidence of both the existence of a contract and Defendant's breach of that contract.

### iii.    Plaintiff Proved Damages.

The Court also finds that Valley provided sufficient evidence of damages and proved its damages "to a reasonable degree of certainty." *Lithuanian Commerce Corp., Ltd.*, 219 F. Supp. 2d at 605.

At trial, Valley proffered testimony from Mr. Scholsser.  He was a credible witness, who clearly was familiar with:  (a) the historical relationship between his company and Valley; (b) Valley's inability to supply the decking material for the Atlanticare Project; (c) what both Valley and Schlosser did to preserve the companies' relationship after it became apparent that Valley would be unable to supply certain decking for this project; and (d) the amount Schlosser withheld paying Valley as a result of Valley's inability to perform.

Mr. Schlosser verified the accuracy of the contents in the letter Schlosser Steel sent to Valley, making plain that "[t]he cost for purchasing the composite deck from the alternate supplier is $220,000."  P-69. He then affirmatively stated that Schlosser Steel withheld "$220,000 from amounts payable to Valley after" sending that letter. Tr. Vol. II 297:16-20.

Mr. Day corroborated Mr. Schlosser's testimony.  He likewise offered credible evidence that the $220,000 represented "the premium" Schlosser was forced to expend "to buy deck from another supplier."  Tr. Vol. III 378:6-7.  And it "was money that Valley was not able to recover under its contract with Schlosser."  Tr. Vol. III 378:8-10.  Mr. Day's testimony thus confirms that Valley failed to recoup $220,000 in monies it would otherwise have received but for OEG's breach.  Accordingly, the Court awards Plaintiff damages in the amount of $220,000.

### 4. The Nestle Project

The dispute surrounding the Nestle Project is more limited in scope.  This is so because Defendant indisputably acknowledged fault and accepted responsibility for the damaged materials that Defendant delivered to Plaintiff. P-41 at OEG_000278.  There is thus no question that the Parties formed a contract, which Defendant breached.  Nothing Defendant either did at trial or argues in its post-trial submission yields a different conclusion.  Nor could it as Mr. Liebes testified that the Parties' "purchase orders" prohibited Defendant from delivering "defective products."  Tr. Vol. III 419:21-23.  And yet, that is precisely what was delivered here.

At trial, Defendant attempted to reverse course on prior statements, trying to create doubt as to which entity is responsible for the non-conforming goods.  Tr. Vol. III 473:15-20; Tr. Vol. III 468:16-473:14.  Its efforts fell short, as Mr. Liebes' testimony on this score was neither credible nor convincing.  *See, e.g.*, Tr. Vol. III 420:7-8 ("I'm apologizing, but I'm not necessarily saying that it was out fault.").  Nor will the Court allow the Defendant to distance itself from Mr. Liebes' statements, which make

explicit that Defendant not only was accepting responsibility for the delivery of non-conforming goods but was committed to "rectifying the issue." P-41 at OEG_000278. Defendant's statements on these points could not be clearer. Defendant stated that: "this should not have happened"; "OEG . . . assume[s] responsibility"; and OEG "agrees to replace the effected sheets." *Id.* Defendant also agreed to cover out-of-pocket costs for "proposed repair work and associated fees" for "sheets already installed." *Id.* And yet, Defendant did nothing; it did not replace the effected sheets and did not reimburse Valley for the repair work done by Valley and its customer. Consequently, the Court easily concludes that Defendant breached the agreement, that Plaintiff incurred damages in mitigating Defendant's breach, and that Defendant has failed to reimburse Plaintiff as promised.

The question thus becomes whether Plaintiff has made a sufficient showing of these damages. Again, it has. At trial, Mr. Day testified credibly about the remediation work triggered by Defendant's breach, as well as Defendant's failure to reimburse Valley for this work. Specifically, Mr. Day explained that Valley sent its "own crew out to do remediation, sand the deck, and touch up the deck with . . . paint. And then we also supplied some of our own deck . . . to replace some of the other rusted deck." Tr. Vol. II 325:10-15; Tr. Vol. III 413:16-18 ("Q. And did OEG ever actually repair or replace those defective goods? A. No."); *see also* P-66 (same). Mr. Day also testified that "the customer hired a contractor [that] repaired some of the areas as well." Tr. Vol. III 414:6-7. When asked how Valley's "customer, RAI" resolved the issue, Mr. Day responded that the company "withheld money from us."

Tr. Vol. III 342:19-23. Mr. Day surprisingly could not, however, recall the exact amount that RAI withheld; he instead testified that he believed the amount was "[i]n excess of $56,000." Tr. Vol. III 344:3.

Based on this testimony, Plaintiff has demonstrated that it sustained damages. However, unlike the other projects at issue in this decision, there is an insufficient amount of evidence to justify awarding Plaintiff the total quantum it seeks. Among other things, Plaintiff's own witness could not specifically remember the amount Plaintiff is out of pocket for this breach. Nor did Plaintiff produce a customer witness to corroborate details relating to remediation/mitigation efforts, as it did with the other projects. Plaintiff likewise did not present a customer witness who could authenticate and get admitted in evidence certain invoices that would have provided support for Plaintiff's damages. *E.g.*, P-72. Plaintiff's damages for this particular project is based on Mr. Day's belief that the amount exceeded $56,000. That is insufficient for this Court to award the full amount requested here.

But that is not a basis to prohibit Plaintiff from being awarded a percentage of the damages it seeks. Indeed, "New Jersey courts have consistently held that: '[t]he rule relating to uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, [*i.e.*,] mere uncertainty as to the amount will not preclude the right of recovery.'" *Lithuanian Comm. Corp.*, 219 F. Supp. 2d at 605 (quoting *Tesmar v. Grosner*, 23 N.J. 193, 203 (1957)). And based upon the specific circumstances here, including *inter alia* Defendant's acceptance of responsibility and promise to rectify the issue, it "would be a travesty to deny . . . plaintiff essential

27

justice because the absence of means for precision precludes perfect justice." *Am. Sanitary Sales Co. v. Dep't of Treasury*, 178 N.J. Super. 429, 435 (App. Div. 1981). Accordingly, the Court will reduce Valley's request for damages in the amount of $56,158.24 by 25% and award Plaintiff a total of $42,118.68.

## IV.    CONCLUSION

As set forth above, the Court finds that Plaintiff has established its breach of contract claims for the Waterfront, Atlanticare, and Nestle Projects. Consequently, judgment shall be entered in favor of Plaintiff on each of its claims in the total amount of $662,118.68.

s/ Justin T. Quinn
HON. JUSTIN T. QUINN
United States Magistrate Judge

Dated: November 18, 2025